Seward, J.
(orally).
This action is brought to enjoin the delivery of $300,000 of the city’s bonds to alleged purchasers, or if the same have been delivered, to enjoin Denison, Prior & Company and Season-good & Mayer from selling or disposing of the same; and, upon final hearing, that the bonds be ordered to be delivered up and canceled, and that the defendants, if the money has been paid in, be restrained from paying the same out.
*610 By an amended petition, the Cleveland Trust Company is made a party, and the plaintiff alleges that he has infoi'mation that the bonds have been placed with said company as security for what it was to advance on the same; that the bonds are not satisfactory iii form; and that it is the intention to have other bonds issued, etc. The sinking fund trustees are made parties.
An injunction is prayed for against A. J. Crilly and Frank T. Maurath, restraining them from signing or affixing the corporate seal of the city of Newark to any bonds under the ordinance of May 16, 1904, or .other bonds of said city, providing for the erection of water works, or any bonds in lieu of or to take the place of said bonds.
The sinking fund trustees are enjoined, with Maurath, their clerk, from registering bonds under said ordinance.
The board of public service is enjoined from making any contract or incurring any liability or obligation on behalf of said city, or paying out any money realized from the sale of the bonds.
The petition alleges that prior to November 15, 1904, by proceedings according to law, the council had authorized the sale of bonds of said city to the extent of $300,000 of the denomination of $1,000 each, interest at 4% per cent., to become due and payable at such time as the ordinance provided; that Crilly was mayor, Maurath was the auditor, and that Jones and Moser were a majority of the finance committee; that Denison, Prior & Company and Seasongood & Mayer are partnerships; that on November 15, 1904, Maurath caused notice to be published of the sale of said bonds at public sale, all bids to be delivered at his office on or before noon of December 15, 1904; that demand was, on the 12th day of December, 1904, served on Philip B. Smythe, city solicitor, to bring an action to enjoin the sale of said bonds on December 15, 1904, because thirty days would not have elapsed between the day of publication and the day of sale; that the solicitor brought the suit on the 14th of “November” (should be December) to restrain the sale of the bonds; that Judge Coyner granted a temporary restraining order restraining the gale of the bonds; that Maurath, upon service of *611 summons, declared the sale of bonds off and returned the bids of a large number of bidders; that on the Í6th or 17th Frank A. Bolton filed a demurrer at the request of Philip B. Smythe; that on the 17th day of December, Smyt°he and Bolton conspired together, and had, without the consent, knowledge or order of the court,, an entry put upon the records of the court sustaining said demurrer and dismissing the petition; that the defendants conspired together to the great detriment and damage of the city and its citizens and tax-payers, to sell said bonds at private sale to Denison, Prior & Company and Seasongood & Mayer, at a much less price than they would bring at public sale, and without any authority of law to make such private sale; that on the 19th of December Crilly, Smythe, Maurath, Jones and Moser pretended to sell the bonds to Denison, Prior & Company and Seasongood & Mayer for $310,150, and Crilly and Maurath pretended to execute them on behalf of the city; that the bonds were never registered; that there was no authority to sell at private sale, the bonds never having been offered at public sale; that the sale was for ten thousand dollars less than they were worth or could have been sold for at any time; that at the time the bids were declared off, no action was taken in any way by the city council, nor at any time, nor were the bids offered under said notice or at all presented to said council, or opened or acted upon by the .council; that on the 21st day of December, demand was made upon Smythe to bring the suit, and he failed to do so ; that he conspired with the defendants in a scheme to accomplish said unlawful private sale, and the same was consummated under his advice.
The defendants have all answered, each denying all conspiraey and illegality in the sales. A motion is made on behalf of the defendants to dissolve the injunction:
1. Because the allegations of the petition and amended petition, in so far as they are denied, are untrue.
2.. That the allegations of the several answers are true.
3. Because the injunction prevents the city from paying interest due upon the bonds, January 1, 1905, demand having been made therefor by the owners and holders of said bonds.
*612 4. Because the injunction prevents the city from using the money now in its treasury for the purpose authorized by law and the ordinances of said city.
5. Because the-action is not brought in good faith, but in the interest of the Newark, Ohio, Water Company, contrary to the express will of the electors of the city. .
6. Because said injunction was wrongfully allowed.-
So that the questions submitted to the court are:
1. As to the legality of the sale.
2. As to the good faith of the plaintiff.
3. As to the good faith of the defendants in the sale of the bonds.
4. As to the failure of Smyithe to bring the suit.
As to the third and fourth grounds of the motion—that is. that the city is prevented from paying the interest and from using the money in the treasury, the proceeds of the sale, for the purpose authorized by the ordinances—while most important to the city and to the citizens, yet they can have but little, if any, force if the sale should be found to be illegal.
We will take up the questions raised in the order in which they have been stated.
First, as to the legality of the sale: There certainly can be no question but what the bonds were sold at private sale and the proceeds of the sale are in the treasury of the city, amounting to $316,525, made up as follows: Face of bonds, $300,000; accrued interest, $6,375, and premium $10,150. This is satisfactorily established from the testimony.
Was the sale made in substantial conformity to the laws governing in the sale of such bonds Í Section 97 of the code provides that such bonds shall first be offered by the municipal corporation to the trustees of the sinking fund, in their official capacity, at par and accrued interest, and only after their refusal to tako all or any of such bonds, at par and interest, bona fide, shall they be advertised for sale.
“All sales of bonds other than to the sinking fund shall be to the highest and best bidder, after thirty days ’ notice in at least one newspaper of general circulation in the county where such pmnicipal corporation. is situated, setting forth the nature, *613 amount, rate of interest and length of time the bonds have to run with the time and place of sale. ’ ’
What are the necessary prerequisites and precedent conditions to an offer or sale at private sale, and have they been complied with?
1st. They must be offered to the trustees of the sinking fund commissioners at par and accrued interest. This was done. 2d. They must refuse to take any or all of them at par and accrued interest. This was done and gives the right to advertise for public sale or offer to sale to the highest and best bidder, after thirty days notice.
This part of the section provides that notice of such sale shall be published thirty days before the day of sale in at least two newspapers of general circulation in the county, and shall set forth the nature, amount, rate of interest and length of time the bonds have to run, with the time and place of sale.
This court has held, in the case of Philip B. Smythe, Solicitor, v. Crilly et al, that this notice contained all the requirements of the statute, to-wit: The nature of the bonds was set out; the amount, rate of interest and length of time to run with time and place of sale, and that the notice was published for the thirty days required. So that if a restraining order had not intervened, and the sale had been made under the bids on file on that day, December 15, 1904, to the highest and best bidder, the contract would have been binding on both the city and the bidder.
The offer to sell at public sale was complete in all its parts up to, at the furthest, within one minute of the time when the sale could have been completed and made, if not up to within a few minutes after the time when the sale could have been completed. The sheriff’s return shows that the injunction was served at 11:59, while Smythe, Moser, Jones, Maurath and Davis testified that the clock had struck twelve before the sheriff made service.
That restraining order allowed in Smythe, Solicitor, v. Crilly et al, supra, was groundless, without merit, either in law or fact, and should never have been granted and undoubtedly *614 would never have been granted if the court had had the time to scrutinize the petition with care; but the restraining order was granted and it was the duty of the parties to obey it, right or wrong, and they did.
The first subdivision of Section 97 provides for sale at private sale, and says:
“When any such bonds have been once so advertised and offered (that is, as is provided for public sale) and the same or any part thereof remain unsold, then said bonds, or as many as remain unsold, may be sold at private sale, at not less than their par value, under the direction of the mayor and the officers and agents of the corporation by whom said bonds have been, or shall be, prepared, advertised and offered at public sale.”
It is -claimed by counsel for plaintiff that the withdrawal of bids would be a rescission of all that had gone before, and that the bonds could not thereafter be sold at private sale without authority of council to sell at private sale; that the mayor and finance committee were without authority to act after withdrawal of bids, and that they must make their report to the city council and get its authority to sell at private sale; that the ordinance authorizing the sale provided for a sale at public sale only, and after that was declared off, nothing further could be done towards effecting a sale without additional or new authority from the city council.
I do not think this contention can be maintained. I am cited to the case of The Gas & Water Company v. Elyria, 57 Ohio State, 374, decided in 1898. In this case it was sought to enjoin the issue and sale of bonds because of certain irregularities, among which was the attempt to authorize the mayor to sell them, and give him discretionary power as to time and manner of sale. The Supreme Court say, at page 382:
“This discretionary power belongs to the council, and can not be delegated by ordinance or otherwise to any person or body. ’ ’
Section 1693 at that time provided that the power or authority to make a contract, agreement or obligation to bind the corporation, or to make an appropriation, shall not be delegated. *615 This section was repealed October 22, 1902, and before the passage of the ordinance authorizing this sale.
While the Supreme Court do not refer to Section 1693, I know of no other section expressly prohibiting the delegation of such authority. The court also say that the provisions of the ordinance in that ease were in conflict with Section 2837a, passed May 19, 1894, which provided that when the issue of bonds have been authorized under Section 2837, the corporation may provide by ordinance for their sale in not more than four different series, and at not more than four different times. That section, that is, 2837a, was repealed April 29, 1902 (see 95 0. L., 322), and can have no force now.
Section 123 of the new code provides that the powers of the council shall be legislative only, and it shall perform no administrative duties whatever, and it shall neither appoint nor confirm any officer or employe, except as otherwise may be provided in this act.
All contracts requiring the authority of the council for their execution shall be entered into and conducted to performance by the board or officers having charge of the matter to ivhich they relate. And after authority to make such contract has been given, and the necessary appropriation made, council shall take no further action thereon.
This was passed in October, 1902, and went into effect May 4, 1903, and it is a radical departure from the old provisions of the code where almost everything must be approved by the council. It provides, as will appear, that all contracts requiring authority of council for their execution shall be entered into and conducted to performance by the board or officers having charge of the matters to which they relate, and after authority to make such contracts has been given, the council shall take no further action thereon.
Section 2 of ordinance passed May 16, 1904, says: Said bonds shall express upon their face the purpose for which they were issued, and that they are issued in pursuance of the ordinance. They shall be prepared, issued and sold and delivered under the direction of the finance committee of the council and the city auditor, and shall be signed by the mayor of said city and the *616 city auditor, and shall be sealed with the corporate seal of said city; and the interest coupons attached to said bonds shall be executed by the city auditor, with 'his signature thereto, or he shall have his signature printed or lithographed thereon and shall be registered in the office of the sinking fund trustees.
Section 3 provides that in case the bonds are not taken by the sinking fund trustees, they shall be advertised for public sale.
As I have before said, it is claimed that this ordinance was exclusive and gave authority to sell only at public sale.
I do not so construe this ordinance and the statutes as to find that no authority was given by the council to sell except at public sale. The statute provides that if offered at public sale, and unsold, that they may be sold'at private sale; and' it seems to me that power to sell given by the council, if unrestrained, would carry with it the power to sell in any manner prescribed by the statute, providing the council had the right to delegate the power to sell, and there is no doubt in the mind of the court on that proposition.
As to the point made by plaintiffs counsel, that a withdrawal of bids worked a rescission of all that had preceded, I entertain a different view from counsel on that point.
The evidence shows that seven bids were filed, and after the service of the injunction they were withdrawn; that at least one of them contained a certified check for $30,000.
My view is that any bidder would have the right to withdraw his bid at any time before its acceptance, and that such withdrawal would not affect the proceedings. The bidder is in no way liable to the city unless he fails, after acceptance of his bid, to receive and pay for the bonds; this is the condition upon which he deposited his certified check for $30,000.
The next question bearing upon the legality of the sale is: Were the bonds once advertised and offered at public sale? If they were not, then the private sale could not be legal, for the law provides that they can not be so sold until after they have been so advertised and offered. There is no question but that they were advertised; so that the sole remaining question *617 on that branch of the case is: Were they offered in the sense of the requirement of the statute?
Bouvier defines an “offer” in reference to a contract as: “A proposal to make a contract.” In this case the offer is a proposal, by advertising, to sell the bonds; and if made in good faith, with the intention of receiving bids and effecting a sale, then the offer is complete, although no bids are received, or although all that had been received had-been withdrawn.
What was the effect of the injunction served on the day of sale? Its legal effect was to stop the sale, so that the bids could not be acted upon. It did not necessarily result in the withdrawal of the bids; that was a matter for the bidders; but there is no doubt but what it did result in their withdrawal. The bidders could have left their bids with the auditor until after the injunction had been dissolved, to be then considered; but they did not see fit to do so.
The sheriff’s return shows that this writ was served at 11: 59, and he says it was served about that time. Smythe, Maurath, Jones and Davis testify that it was not served until after the clock had struck twelve. The difference in time of different time-pieces might account for the difference in the testimony in this regard. Mr. Anderson does not seem to have any distinct recollection of the time outside of the record.
Holding as I do, that the bonds were advertised and offered, and that the bidders had the right to withdraw their bids before acceptance, the time is not so material, especially when it is a question of one minute.
As to the good faith of the plaintiff in this ease: The testimony shows that the first suit was instituted by the plaintiff at the instance of Mr. Yeach, who was and still is the superintendent or manager of the water company. There is no evidence that the plaintiff ever thought of bringing the suit until he was approached and importuned by Mr. Yeach. The plaintiff had not consulted counsel; Mr. Yeach had. He had importuned Mr. Donovan,'at Mr. Donovan’s residence, some nine or ten days before. Mr. Donovan says he asked Yeach if it would not be better to bring the suit so that it would be heard before the time of sale (and this, I must say, was not an.unreasonable sugges *618 tion to a mind actuated by a purpose whose only object was to see that the proceedings were legal). If there was anything illegal about the proceedings, why not have it determined before the day of sale?
Mr. Yeach said: We don’t want the sale. If we can stop the sale, Mr. Miller will have the ordinance for the sale of the. bonds repealed by the council. Why repeal the ordinance authorizing the sale if there was only a mere irregularity in the notice? Why prevent the sale by the repeal of the ordinance? If the advertisement was insufficient, why] not let them re-advertise ? Let his further talk with Mr. Donovan answer. Mr. Donovan says that Mr. Yeach said: “If the bonds were sold the money had to go to the building of a new water works, and we will see that there is no other ordinance again giving them power to sell the bonds.” Mr. Yeach does not deny this conversation with Mr. Donovan. He says himself that he endeavored to have the council repeal the ordinance for the sale of the bonds. That his whole object was to get an opportunity to have the water works plant appraised with a view of seeing if it could not be sold to the city. “If it could not be sold, I had no objection to the issuing of the bonds; until I could get them to present the matter to the city council.” He says: “Nothing else has ever been in my mind.”
When asked whether the sole object has not been simply to get the council to investigate the plant so as to come to some conclusion as to whether they could buy it at a profit,” this question being put to him by counsel for the plaintiff, he answered: “Wholly so; I have had charge of the entire matter. It is absolutely so; there is nothing else in it.” He says he “talked with Mr. Yadakin about bringing the suit; had him in mind for a day of two; thought he was a good man to bring the suit.”
I can not reach the conclusion that Mr. Yeach had any other interest at heart but that of the water company, and that he procured Mr. Yadakin to bring the suit solely to further the interest of the water company. He went with Mr. Yadakin to Flory’s office. Mr. Yadakin had never before that visit consulted with Mr. Flory about the matter. There he found a motion, ready-prepared to serve on Mr. Smythe. He signed it, *619 and thus, at the request of Mr. Veach, set in motion forces which have caused all this trouble, and wrongfully prevented a sale of the bonds at public sale. The stream can not rise higher than its fountain, and is usually impregnated with the same elements where not far removed from its source.
But it is claimed that the case at bar is a different suit; and that is true; but is it not the' same stream, a little further from the fountain or source?
It is quite apparent that the petition was prepared on the 20th of December, the next day after the meeting of the council, at which a resolution prepared at the instance of Mr. Veach was to be introduced, as he says, by Mr. Miller. Mr. Veach says he talked with Mr. Jones the next morning. Mr. Jones says he helped to prepare the petition on the forenoon of the 20th. The evidence does not show that up to this time Mr. Vadakin had been' consulted. He is made plaintiff. Mr. Flory takes the petition up to his house. Mr. Vadakin said he would look over it and bring it down. Mr. Jones says that Mr. Vadakin never spoke to him about acting for him in the matter, but that on the day he set about to draft the petition, he thought Mr. Vadakin would be plaintiff. Whether he got that impression from the fact that he was plaintiff in the other suit, or from his talk with Mr. Veach on the morning of the 20th, or from other sources, does not appear.
It is claimed by the solicitor that the plaintiff has no standing in court for the reason that he was not given an opportunity to bring the suit.' Section 1777 provides that the-solicitor shall prosecute such actions. Section 1778 provides that if he fail to bring the suit, upon request of a tax-payer, that then it shall be lawful for such tax-payer to institute the proceedings.
On the morning of the 21st, the day the suit was brought, a request was served upon him to bring the suit. He claims that he did not refuse to bring the suit; that the person who served the notice told him that he would give him just two minutes to determine what he would do. He says the notice was served on him after eight o’clock in the morning, and that the petition was filed by the plaintiff within two hours. It is claimed - by the plaintiff that the petition was not filed until afterwards, but the summons shows that it was received by the *620 sheriff at eleven o’clock a. m. An amended petition was filed, which might account for the discrepancy; but the plaintiff did not expect or desire that he shquld bring the suit, as the charge of bad faith is made in the other case.
Now, as to the charge of conspiracy and bad faith of the defendants : ' ■
This is charged, and both parties have gone into it. Reference is made to the pleadings and the evidence as to the entry which found its way upon the journal of the court, purporting to be the judgment of the court sustaining a demurrer to the petition, when the matter had never been called to the attention of the court, and the court had had no opportunity to pass upon the demurrer.
The court referred to this matter in its opinion in that case as an act most reprehensible in its character. No emergency, real or apparent, can justify such conduct on the part of the council. The haste with which the sale of the bonds was ■ consummated, the manner of its consummation, and the price at which sold, are referred to as suspicious circumstances; and the court is free to say.that it does not understand why, in order to avoid any controversy, or ground of suspicion, the bonds were not re-advertised, or more deliberation used in effecting .the private sale. And as to corrupt motive, it is not necessary to find and I do not find that there was such motive, but do not hesitate to announce that each represented a different, distinct and antagonistical interest and that each was putting forth his utmost endeavor to see that the interest be served, was successful in the contest and probably went further than good judgment and discretion would warrant or fairness approve.
It seemed to have been a race between the water company and the city officials, the one to prevent, the other to effect a sale of these bonds. I say “the water company,” because I feel satisfied that it is the moving factor in the matter.
But, was there any conspiracy? If so, by what evidence is it made manifest? It is claimed that there was great haste. Well, everything in the matter at this time moved rapidly, excepting the serving of the first injunction; that was delayed longer than was for the welfare of the- city and the tax-payer, *621 so that the court could not have an opportunity to pass upon it before the day of sale. If the parties entrusted with the sale had the legal right to sell at private sale, they were under no obligation to await the pleasure of any other person or persons. I myself think there was more haste than was demanded, or that was - consistent with good judgment, but I have no right to say when a thing shall be done which the parties have the right to do in the present. Unless that haste resulted in damage to the city or was precipitated from a corrupt motive, no one has a right to complain.
Jones ■& Jones and Flory & Flory, for plaintiff.
Phil. B. Smythe, A. A. Stasel, J. B. Fitzgibbon, Kibler <# Kibler, Ford, Snyder $ ffenry, for defendants,
Inadequacy of price paid for the "bonds might be a badge of fraud or of lack of business capacity. It is claimed that the price claimed was greatly inadequate. Mr. Gaumender says that the sale was a reasonable one. Mr. Kennedy fixes the premium on such bonds at that time at 3.40 per $100. This would be $10,200. The amount paid was $10,150, which would be just 3.381-3 on the $100. I know that "certain affidavits of agents for bond houses are presented, which state that they were worth much more; but this is easy to believe by an interested party. One of these affidavits, I believe, says his firm had a bid in for said bonds, but he is not able to ‘say what the bid was. I doubt whether these bonds would not have brought a better price if this sale had not been made with such haste. There was, in my opinion, bad management, but mismanagement, without corrupt motive, is not ground for interference. How easy it Avould have been to have re-advertised or invited other bids? It Avill not do to say that they feared an injunction. That would be a reflection upon the courts.
I hold that this suit was not brought in the interest of the city, but in the interest of the Avater company; that the bonds had been properly advertised, and offered, as required by law, and that they remained unsold; that the officials had the right to sell them at private sale, under the statute; that there was no conspiracy to defraud the city in the sale; and the motion Avill be sustained and the injunction dissolved.